AUTOMOBILE CLUB OF NEW YORK,
INC. and AAA Clubs of New
Jersey, Plaintiffs,

v.

The PORT AUTHORITY OF NEW YORK
AND NEW JERSEY, Philip D. Kalten-
bacher, Robert F. Wagner, Richard C.
Leone, James G. Hellmuth, Henry F.
Henderson, Jr., William K. Hutchinson,
H. Carl McCall, John G. McGoldrick,
William J. Ronan, Howard Schulman,
Robert Van Buren, Hazel Frank Gluck,
as Commissioners of the Port Authori-
ty of New York and New Jersey, Defen-
dants.

No. 87 Civ. 2419 (MP).

United States District Court,
S.D. New York.

Feb. 9, 1989.

As Corrected Feb. 15, 1989.

Kissam & Halpin by Anthony S. Genovese, New York City, for plaintiffs.

Joseph Lesser by Milton H. Pachter, Arthur P. Berg, Sholem Friedman, New York City, for defendants.

MILTON POLLACK, Senior District Judge.

The central issue in this case is whether it is "just and reasonable" for the Port Authority to include its investment in and the mounting operating losses of the Port Authority Trans–Hudson (PATH) Railroad in the Port Authority's rate base for determining the tolls to be charged for passage over the bridges owned by the Port Authority between New York and New Jersey.

This is an action for declaratory judgment and injunctive relief.

Plaintiffs, Automobile Club of New York, Inc. and five member AAA Clubs of New Jersey ("the Auto Clubs"), sue for a declaratory judgment that the 1987 Port Authority increase in its bridge tolls violates section 135(i) of the Federal–Aid Highway Act of 1987 (the "Highway Act"), 33 U.S.C. § 508 (Supp.V.1987), 42 U.S.C. § 1983 (1982), and the Commerce Clause of the federal Constitution. Plaintiffs seek imposition of a constructive trust on alleged excess charges collected by the Port Authority as a result of the increase, and for restitution thereof.

The Auto Clubs filed an Amended Complaint on October 7, 1988 adding twelve Port Authority Commissioners as defendants in response to the Port Authority's contention that the Agency enjoys immunity from suit in federal court under the Eleventh Amendment of the Constitution. Jurisdiction of the First, Second, and Fifth Claims for Relief is posited under 28 U.S.C. §§ 1331(a) and 2201–02; jurisdiction of the Third and Fourth Claims for Relief is asserted under principles of pendent jurisdiction.

The action now before the Court is not unlike the one brought by the Auto Clubs in 1977 attacking a 1975 toll increase on the Authority's bridges, which resulted in denial by this Court of relief to the Auto Clubs. *Automobile Club of New York, Inc. v. Cox*, 444 F.Supp. 174 (S.D.N.Y.1978) (Pollack, J.), *aff'd*, 592 F.2d 658 (2d Cir.1979).

The witnesses were heard and the evidence was received in this case at a Bench Trial on November 28 and 29, 1988. Most of the facts were stipulated by the parties.

At the close of the plaintiffs' case the Port Authority moved for a directed verdict dismissing the amended complaint for failure to establish a *prima facie* case. The Auto Clubs claimed that they had presented sufficient facts from which to draw an inference that the tolls were unreasonable and unjust to users of the bridges. The Auto Clubs urged that the PATH operations should not form a part of the Port Authority rate base in the absence of statutory authorization therefor. However, they conceded that if PATH were included in the rate base the Port Authority's overall rate of return on its Interstate Transportation Network ("ITN") facilities would be "within the zone of reasonableness." The Court reserved decision on the motion to dismiss.

At the close of the entire case, the Port Authority renewed its motion for dismissal of the amended complaint, asserting that the Auto Clubs had completely failed to make out a *prima facie* case and had adduced no credible evidence why PATH should not be included in the Port Authority rate base. The Port Authority argued that it had established by unrefuted testimony that PATH should be included in the toll base as an essential and integral part of the Port Authority's ITN. The Court again reserved decision.

For the reasons appearing hereafter, the Auto Clubs are not entitled to relief herein and the motions to dismiss the amended complaint and for judgment in favor of the defendants will be granted.

## THE FACTUAL BACKGROUND

Plaintiffs, the Automobile Club of New York, Inc. and the AAA Clubs of New Jersey, are non-profit organizations organized with the intention of promoting the interest and welfare of motor vehicle users.

The Port Authority is an agency of the States of New York and New Jersey, created in 1921 by an interstate compact between them with the consent of Congress. 42 Stat. 174 (1921). Its principal purpose was to effectuate "a better coordination of the terminal, transportation and other facilities of commerce in, about and through the

Port of New York." N.Y.Unconsol.Law § 6401 (McKinney 1979). The term "transportation facility" was in turn defined to include, *inter alia,* "railroads, steam or electric ... tunnels, bridges, boats, ferries ... and every kind of transportation facility now in use or hereafter designed for use for the transportation or carriage of persons or property." *Id.* at § 6423.

Pursuant to its powers under the compact and amendments and supplements thereto, the Port Authority owns and/or operates in its Interstate Transportation Network, four interstate bridges (the George Washington Bridge, the Bayonne Bridge, the Goethals Bridge, and the Outerbridge Crossing), two interstate tunnels (the Lincoln Tunnel and the Holland Tunnel), the PATH system, and the Port Authority Bus Programs.

The Port Authority's bridges, tunnels, terminals, PATH and Bus Programs are involved in the movement of people and freight across and under the interstate waters of the Port of New York District, which encompasses the area lying within a 25–mile radius of the Statue of Liberty.

The number of passengers travelling eastbound during a typical weekday peak period (7:00–10:00 a.m.) by auto, rail, and bus via Port Authority facilities over the interstate waters between New York and New Jersey has increased since 1967 as follows:

|  | 1967 | 1977 | 1987 |
|---|---|---|---|
| Automobile | 55,200 | 66,900 | 78,500 |
| Bus | 75,100 | 63,400 | 81,500 |
| PATH* | 43,700 | 48,200 | 69,400 |

* In 1987 24,000 passengers also travelled by other rail to Penn Station, New York

All four Port Authority bridges were constructed in accordance with the provisions of the General Bridge Act of 1906, 33 U.S.C. § 494 (1982), which required that the tolls for transit over them be "just and reasonable." Until 1987, the Federal Highway Administrator ("the Administrator") determined whether such toll increases were in fact "just and reasonable." 49 C.F.R. § 1.48(i)(1).

On April 2, 1987, Congress enacted the Federal–Aid Highway Act of 1987, 33 U.S. C. § 508 (Supp.V.1987) ("the Highway Act"). The Highway Act repealed the Administrator's authority to review Port Authority toll increases and also provided that:

Tolls for passage or transit over any bridge constructed under the authority of the ... Bridge Act of 1906 ... shall be just and reasonable.

33 U.S.C. § 508 (Supp.V.1987).

Effective April 12, 1987, the Port Authority increased the non-discounted, eastbound passenger car tolls on its bridges and tunnels from $2.00 to $3.00. Bus tolls were increased from $2.00 to $3.00 and truck tolls rose from $1.50 per axle to $3.00 per axle. These tolls are charged only in the eastbound direction. In addition, the price of the Commuter Discount Ticket Book of 20 tickets increased from $20.00 to $40.00. PATH fares are charged for service in each direction (east or west), and were raised from $.75 to $1.00 each way, or $2.00 a round-trip.[1]

The history of the April 1987 toll and fare increases was established without controversy as follows.

On November 24, 1986, the Port Authority's Executive Director submitted a report entitled "Capital Needs and Planning for the Port Authority Interstate Crosswater Facilities" ("the Port Authority Report") to the Port Authority's Commissioners. The report outlined the sharp growth in usage of the Port Authority's Interstate Transportation Network of cross-water facilities, the actions taken by the Port Authority to meet this growth, the magnitude of the need for rehabilitation and modernization of the Port Authority ITN facilities and the inability of the system to provide sufficient revenues to cover the cost of the required capital improvements to the network.

The Port Authority Report projected that nearly $1.5 billion would have to be expended between 1987–1991 for capital improve-

---

**1.** Prior to 1987, PATH fares had increased from $.30 to $.50 in 1983, and from $.50 to $.75 in 1984.

ments and additions to Port Authority facilities to continue the safe, reliable operation of the ITN and to meet projected demands for increased ridership. The Port Authority's plans were to add capacity through a PATH system capacity improvements program, a proposed implementation of a ferry service from Hoboken, New Jersey to Lower Manhattan and a possible expansion at the Staten Island Bridges.

The Port Authority Report also indicated that the ITN required substantial additional revenues to support the funding of these and other capital expenditures, since the ITN could not "generate" the required additional revenues under its then-existing current fare and toll structure. In fact, the report indicated that the network was generating insufficient revenues to cover its operating expenses, and that the gap between operating expenses and revenues was projected to widen significantly in the future.[2] The report made clear that the deteriorating service on PATH had led (and, no doubt, would continue to lead) to intolerable crowding on the vehicular crossings.

Four months after the Executive Director submitted that report, the Port Authority's Board of Commissioners adopted a resolution effective April 12, 1987, increasing the tolls which are under attack here and stating, among other things:

it has become necessary for the Port Authority, as a self-supporting agency, to readjust the rates of toll charged for use of its bridges and tunnels. This adjustment is required to sustain the agency's ability to maintain and finance its facilities, especially its Interstate Transportation Network, and to retain its sound financial standing.

In reaching this decision, the Port Authority Board also considered several significant objects of the toll increase: it sought to achieve a reasonable balance against competitive fares (especially inter- and intra-state fares); to increase revenue yields in order to limit the growth of the PATH operational deficits; to achieve operational simplicity in fare collection by establishing a round number for the tolls; and to minimize any negative effects upon the travelling public.

The trial testimony indicated that it is not feasible to charge a fare on PATH that would be equal to all of the costs associated with running PATH: fare box revenues for comparable transit systems typically produce about 50 percent of the direct expenses of running such systems, and the Port Authority Treasurer testified that the $1.00 one-way PATH fare produced "that kind of relationship" for PATH. The testimony also showed that the expenses incurred by PATH in providing mass transit services to its passengers are reasonable and necessary and consistent with the Port Authority's duty to maintain tolls that are fair and reasonable. The Board considered these as well as the other factors mentioned above in setting its bridge and tunnel toll rates and its PATH fares; and that consideration stamps its action as a rounded, sound, and informed judgment.

The parties estimate that the 1987 toll increase will generate an additional $146 million in annualized revenues above the pre–1987 rates. The Auto Clubs contended but failed to establish that the bridge, tunnel and terminal surplus is already sufficient to pay for all bridge, tunnel and terminal projects under the proposed $1.5 billion Capital Program without these additional revenues.

Importantly, the Auto Clubs conceded at trial that the rates of return from the 1987 tolls are "within the zone of reasonableness" if they include the PATH deficits in the rate base, and that even if PATH is *excluded* from the rate base, under the "replacement cost method" the resultant

---

**2.** In 1986 the Port Authority operated its bridges, tunnels, and terminals at an annual surplus of roughly $30 million (taking into account operating and maintenance expenses, allocated expenses, and depreciation). By contrast, when deficits from PATH and the Bus Programs are factored into the same equation, it results in an overall deficit of $90.7 million in 1986 for all Port Authority ITN facilities. The PATH deficits in particular have risen dramatically over the years: in 1977 the PATH deficit was at $34 million, in 1987 the deficit had run to $87 million, and it is projected that in 1991 the deficit will be $133 million.

rates of return are also "within the zone of reasonableness."[3] The Auto Clubs, however, contended but failed to establish that PATH is not sufficiently related to the Port Authority bridges in order to justify the inclusion of any such PATH deficits in the rate base, and that without PATH the tolls are unreasonable and will generate revenues "well in excess of what is necessary to provide for the construction, operation, or maintenance of its bridges, tunnels and terminals."

Plaintiffs' entire case is premised on the contention that while the "just and reasonable" provision of the Highway Act permits this Court to view the Port Authority's bridges, tunnels and bus terminal as one system in assessing the reasonableness of the Port Authority's bridge tolls, it does not permit the consideration of PATH as a bridge-related component of the Port Authority's ITN. In support of this proposition the Auto Clubs produced the Executive Vice–President and Treasurer for the Auto Club of New York, who gave as his opinion that the bridges, tunnels, and PATH do not constitute one integrated system, but rather two distinct systems: the Hudson River crossings (with some use of the George Washington Bridge associated with it) for those people whose destination is the Central Business District of Manhattan ("CBD"), and the Staten Island Bridge system, which functions as a bypass to the CBD.

The Auto Clubs acknowledged that "there is a relationship, concededly, between PATH and the tunnels, there is some small relationship between PATH and the George Washington Bridge," but contended "there is practically no relationship between PATH and the Staten Island Bridges." Plaintiffs were unable to quantify, under their theory, what a fair inclusion in the rate base of the cost of operat-

ing PATH would amount to, though their counsel suggested that PATH should be included to "a minimal extent."

On the other hand, the Port Authority presented satisfactory evidence that the financial results and requirements of the PATH system are appropriate factors to be considered in assessing the reasonableness and justness of its bridge tolls, and that as a factual matter bridge users do benefit from investment in the related non-bridge ITN facilities such as PATH which form part of the integrated interdependent transportation system to facilitate mass movements across and under interstate waterways.

The Port Authority has credibly demonstrated that PATH provides a very real and substantial benefit to the users of Port Authority bridges, and that without PATH the Port Authority's interstate transportation system would "break down completely."

The Port Authority has clearly established that the efficient and cost-effective functioning of its interstate transportation facilities requires their maintenance and operation as a single integrated, interdependent transportation system. All of the facilities, including PATH, are operating at full capacity during peak periods. The closing of one or more of the Port Authority's under- and cross-water facilities thus results in a "spillover," or "domino," effect, increasing congestion in the others. The trial testimony showed that without PATH, the Holland and the Lincoln Tunnels become overtaxed, and if the tunnels become congested, the spillover traffic adds "significant loads" to the Staten Island Bridges and the George Washington Bridge. Similarly, improvements to one facility benefit the users of the others by

---

**3.** There are essentially three methods for computing profits and rates of return on its facilities such as those in the Port Authority's ITN. The replacement cost method uses the current value of Port Authority facilities based on construction cost indices over time. By contrast, the gross investment method uses solely the original cost of facilities to calculate rates of return, and the unamortized investment in use method in-

cludes all depreciation and amortization of facilities in the equation. The replacement cost method tends to produce lower rates of return on investment because it utilizes a higher cost of investment than the unamortized investment in use method, which subtracts from the cost of investment depreciation and amortization over time.

reducing congestion on others, thereby making the entire network more efficient.

The evidence credibly demonstrated that the inclusion of PATH's financial results in the rate base was both reasonable and necessary on at least two major grounds: first, were PATH to be eliminated, a replacement would be necessary to maintain the integrated system, and second, a replacement would run the Port Authority into a larger expense than the PATH deficit. It was adequately established that it is cheaper to keep PATH in existence than to create a supplemental facility which would be needed were it not part of the system. In short, it would be less expensive and less costly to continue to use PATH than to pay over an estimated $2 billion, not including land acquisition costs, for constructing a "PATH substitute," such as adding buses and another tube at the Holland and Lincoln tunnels.

The Treasurer of the Port Authority testified that without the toll and fare increases, it would have been impossible to fund projected operating deficits of the network and its $1.5 billion capital program. He pointed out that in the year prior to the 1987 increase, the rate of return based on the most conservative method of computing rates of return on Port Authority's ITN facilities, the unamortized investment in use method, was negative if PATH were included in the rate base.[4] Moreover, even without PATH, the rate of return using the same method was only 4.9%. The witness testified that the Port Authority's non-ITN facilities would have been inadequate to take care of the Network's operating deficits and capital program without the 1987 toll increase.

It is undisputed that without the toll and fare increase, the Port Authority would have been precluded from issuing new consolidated bonds by the year 1990 because it could not have met the Port Authority's bond indenture coverage requirement. This requirement mandates that net revenues of a prior twelve-month period preceding the issuance of the new bonds must be covered by 1.3 times the debt service on all of the outstanding bonds in the future calendar year in which such debt service is at a maximum.

Dr. Matityahu Marcus, a Professor of Economics at Rutgers University and a recognized expert in rate proceedings, testified that the tolls at issue are, from several perspectives, "reasonable and just" under several different formulations of that standard. He then elaborated on the basis for his eventual conclusion that "it makes no economic sense" to exclude PATH from the base on which to establish reasonable and just tolls for the bridges in the Port Authority network:

Fundamentally, a rate base is an economic concept, and facilities that are used in the production of the particular service, the investment in those facilities should be treated as one rate base and should be included in the rate base.

In this particular case the service that we are talking about is river crossings. There is no question, I think, in my mind and based on what I have read, that a crossing that is being made by using one particular facility, say a tunnel, the service quality of this crossing is directly dependent upon there being other facilities that other commuters or other drivers are using.

So, in effect, the service that one obtains by using one facility is produced jointly by there being a number of other crossings. So from an economic point of view you are really talking about all these facilities being combined to provide a generic service, crossing of a particular river.

I would say this is not uncommon in economics. When we talk about electric utility regulation it is not unusual to have several different plants producing electricity at different costs, yet from the point of view at single cost per kilowatt-hour because for all intents and purposes the product in that case is being produced jointly, even though some of the plants are separated locationally, and I think this is a situation where we talk

---

4. See footnote 3, *supra*.

about the river crossing in this particular case.

Dr. Marcus's testimony thus indicates that from an economic perspective it is necessary and appropriate to include in the investment rate base all the elements of the Port Authority's Interstate Transportation Network, including PATH.

In addition to their assertion that PATH may properly be included in the Port Authority rate base under the federal Highway Act, the defendants asserted several affirmative defenses to the Auto Clubs' amended complaint: (1) that the Auto Clubs lack standing to bring suit and failed to serve a timely notice of claim under the Port Authority's suability statutes, N.Y. Unconsol. L. § 7101–12 (McKinney 1979) and N.J.S.A. 32:1–157 to –174 (West 1963) (providing that only the Attorney General of New York or New Jersey may bring such actions against the Port Authority, and that he must do so by serving a notice of claim on the Port Authority 60 days before suit is commenced); and (2) that the Court lacks subject matter jurisdiction over the Auto Clubs' claims against the Port Authority under the Eleventh Amendment.

## DISCUSSION

■ The Port Authority's first affirmative defense may be disposed of summarily. First, the Auto Clubs have standing to challenge the 1987 toll increase on behalf of their membership. *See New York State Club Ass'n v. City of New York,* — U.S. —, —, 108 S.Ct. 2225, 2232, 101 L.Ed. 2d 1, 13 (1988). Second, the state "suability" statutes cited by the defendants bear little application to actions brought against the Port Authority in federal court. The defendants' defense of Eleventh Amendment immunity from suit, however, requires more discussion.

### A. *Defendants' Immunity from Suit under the Eleventh Amendment*

As a general rule, the Eleventh Amendment bars suits against a state brought either by citizens of another state or by its own citizens in federal court. *Edelman v. Jordan,* 415 U.S. 651, 663, 94 S.Ct. 1347, 1355, 39 L.Ed.2d 662 (1974).

Eleventh Amendment immunity also extends to suits against state agencies such as the Port Authority. *See Port Authority Police Benevolent Association, Inc. v. Port Authority of New York and New Jersey,* 819 F.2d 413, 418 (3d Cir.), *cert. denied,* — U.S. —, 108 S.Ct. 344, 98 L.Ed.2d 370 (1987); *Feeney v. PATH,* 693 F.Supp. 34 (S.D.N.Y.1988); *Borough of Fort Lee v. Port Authority of New York and New Jersey,* Civ. Action No. 87–1238 (D.N.J. March 14, 1988) [1988 WL 24146].[5]

Eleventh Amendment immunity may be waived, however, if (1) the state expressly waives its general immunity to suit in federal court; or (2) Congress abrogates the state's immunity by providing by statute for suits against the state. *Welch v. State Department of Highways and Public Transportation,* 483 U.S. 468, 107 S.Ct. 2941, 2945–47, 97 L.Ed.2d 389 (1987). The courts, however, will find a waiver by the state "only where stated 'by the most express language or by such overwhelming implications from the text as [will] leave no room for any other reasonable construction.'" *Edelman,* 415 U.S. at 673, 94 S.Ct. at 1359 (quoting *Murray v. Wilson Distilling Co.,* 213 U.S. 151, 171, 29 S.Ct. 458, 464, 53 L.Ed. 742 (1909)). Similarly, Congress must "unequivocally" express its intention to abrogate the Eleventh Amendment in "unmistakabl[e]" language in the statute itself. *Atascadero State Hospital v. Scanlon,* 473 U.S. 234, 242, 243, 105 S.Ct. 3142, 3147, 87 L.Ed.2d 171 (1985).

■ The Auto Clubs contend that Congress abrogated the Port Authority's immunity when it enacted a comprehensive federal regulatory scheme under the Bridge Act to adjudicate challenges to the bridge tolls, with exclusive federal review

---

**5.** The plaintiffs do not, at this time, challenge the Port Authority's standing to assert the immunity defense as a bi-state agency inasmuch as this issue is presently before the Second Circuit Court of Appeals. *See Feeney v. Port Authority Trans-Hudson Corp.,* 693 F.Supp. 34 (S.D.N.Y.), *appeal docketed,* No. 88–7797 (2d Cir. Sept. 12, 1988).

of determinations made by the Administrator under the Administrative Procedure Act, 5 U.S.C. § 702 (1982).[6] Specifically, the Auto Clubs assert that Congress necessarily abrogated the Port Authority's immunity when it originally subjected all "persons" (including municipalities) to the Bridge Act's mandate that all tolls be just and reasonable.[7]

This argument fails for several reasons. First, the General Bridge Act was repealed in 1987 and replaced by the Federal Highway Act, 33 U.S.C. § 508 (Supp. V 1987), which omits all references to "persons" subject to the General Bridge Act. Second, the mere conferral of federal (as opposed to state) jurisdiction over toll disputes does not necessarily eliminate the availability of Eleventh Amendment immunity if those toll disputes involve facilities owned by state governmental entities: it controls the plaintiffs' choice of forum in challenging such tolls, but does not control the plaintiffs' choice of defendants against whom they may assert the challenge. In short, the language of 33 U.S.C. § 508 does not constitute an "unequivocal" waiver of Eleventh Amendment immunity required by the Supreme Court in *Atascadero* and *Welch*, *supra*.

■ The Eleventh Amendment does not, however, preclude suit against state officials in federal court if the relief sought is prospective in nature. *Edelman v. Jordan*, 415 U.S. 651, 667, 94 S.Ct. 1347, 1362, 39 L.Ed.2d 662 (1974) ("a federal court's remedial power, consistent with the Eleventh Amendment, is necessarily limited to prospective injunctive relief, and may not include a retroactive award which requires the payment of funds from the state treasury"). This is true regardless of whether such payment is characterized as monetary damages, as "equitable restitution," or as a "constructive trust" of funds which are alleged to have been improperly obtained by defendants in the first place. *Id.* (equitable restitution); *Comm. of Pennsylvania Dept. of Environ. Res. v. Williamsport Sanitary Auth.*, 497 F.Supp. 1173, 1195 (M.D.Pa.1980) ("For Eleventh Amendment purposes, there is no distinction between damages, imposition of a constructive trust or injunctive relief requiring [the state] to pay [the prevailing party] $198,-600.00").

■ Accordingly, all of the Auto Clubs' claims must be dismissed insofar as they request relief from the Port Authority directly, or insofar as they request relief from the Port Authority Commissioners that is not purely prospective. That is, the third and fourth claims (for the imposition of a constructive trust and for equitable restitution) must be dismissed altogether; the second and fifth claims (for injunctive relief) must be dismissed insofar as they request the Court to direct that funds received pursuant to the toll increase be applied to reduce future tolls to a level below that which existed prior to 1987; and the first claim (for declaratory relief) remains intact against the Commissioner defendants.

## B. *Plaintiffs' Claims for Prospective Relief under the Highway Act*

Plaintiffs' claims under the Highway Act center on whether the Port Authority's

---

**6.** 5 U.S.C. § 702 provides in relevant part:
A person suffering legal wrong because of agency action ... is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages ... shall not be dismissed on the ground that it is against the United States.

**7.** Section 494 of the General Bridge Act formerly provided:
The persons owning or operating [bridges governed by the General Bridge Act] shall maintain, at their own expense, such lights and other signals thereon as the Commandant of the Coast Guard shall prescribe.... If tolls shall be charged for the transit over any bridge constructed under the provisions of the General Bridge Act ... such tolls shall be reasonable and just, and the Secretary of Transportation may, at any time, and from time to time, prescribe the reasonable rates of toll for such transit over such bridge....
33 U.S.C. § 494 (1982).
Section 479 of the Act then went on:
The word "persons" as used in [section 494] ... shall include municipalities, quasi municipal corporations, corporations, companies, and associations.
*Id.* at § 497 (1982).

1987 toll increase was "just and reasonable" under the Act. The determination of whether the toll increase is "just and reasonable" in turn depends on two considerations: (1) whether Port Authority ITN facilities other than bridges, tunnels, and terminals may be included in the initial rate base upon which its rates of return are derived, and (2) whether the toll increase produces a reasonable rate of return upon the Port Authority's investment in the ITN facilities which are included in its rate base.

▪ The Auto Clubs contend that PATH cannot be included in the Port Authority rate base for two reasons. First, it asserts that there is no relationship between the PATH and the Staten Island Bridges, and only a small relationship between the PATH and the George Washington Bridge. Second, it asserts that the Port Authority has not made reasonable efforts to maximize PATH revenues such that it would be unjust and unreasonable to require motorists to continue to subsidize PATH's deficit operations by subsuming it into the rate base.

Neither the legislative history of the Highway Act or its predecessor, the General Bridge Act of 1906, shed much light on the degree to which the Port Authority facilities at issue must be related in order to include them in the same rate base. The Conference Report on the Highway Act does, however, indicates some flexibility in including facilities other than bridges, tunnels, and terminals in the Port Authority rate base:

This just and reasonable requirement [under 33 U.S.C. § 508] is not intended to interfere with or in any way restrict existing authority granted to multi-modal transportation agencies, such as the Port Authority of New York and New Jersey, that operate bridges along with other facilities *to use bridge toll revenues for non-bridge purposes or the pooling or combination of the revenues from all of their facilities.*

H.Conf.Rep. No. 100–27, 100th Cong., 1st Sess. 175, *reprinted in* 1987 U.S.Code Cong. & Admin.News 66, 159 (emphasis added).

This view is bolstered by Congress' contemporaneous repeal of Section 506 of the General Bridge Act of 1946, 33 U.S.C. § 529 (1982), which had expressly limited the use of toll revenues to specific bridge-related purposes.[8]

No cases to date have interpreted the new "just and reasonable" provisions of the Highway Act. However, the sparse case law under the General Bridge Act also suggests that facilities other than bridges may be used in the same rate base.

In *Clarksburg–Columbus Short Route Bridge Co. v. Woodring,* 67 App.D.C. 44, 89 F.2d 788, *remanded for dismissal as moot,* 302 U.S. 658, 58 S.Ct. 365, 82 L.Ed. 509 (1937), the Court of Appeals disapproved of the mandatory lowering of a bridge toll without taking into consideration the effect of the decrease upon the owner of a competing bridge. In so holding, the court established the principle that a toll producing a seemingly unreasonably high rate of return may in fact be reasonable if its rate base does not include other facilities which are related to the facility in question.[9]

---

8. 33 U.S.C. § 529 formerly provided:

If tolls are charged for the use of an interstate bridge constructed or taken over or acquired by a State ... the rates of toll shall be so adjusted as to provide a fund sufficient to pay for the reasonable cost of maintaining, repairing, and operating the bridge and its approaches under economical management, and to provide a sinking fund sufficient to amortize the amount paid therefor, including reasonable interest and financing cost.... After a sinking fund sufficient for such amortization shall have been so provided, such bridge shall thereafter be maintained and operated free of tolls.

9. In the only other case addressing the "just and reasonable" provisions of the General Bridge Act, *City of Burlington v. Turner,* 336 F.Supp. 594 (S.D.Iowa 1972), *mod'd and aff'd,* 471 F.2d 120 (8th Cir.1973), the Court of Appeals remanded the case to the Federal Highway Administrator, directing that the definition of "reasonable and just" include a reasonable return on invested capital. 471 F.2d at 123. This holding, however, does not address the issue of whether non-bridge facilities may be included in the Port Authority's rate base; rather, it relates only to the question of whether a rate of return is

Of course, the most closely-related decisions to the present are those rendered by this Court and by the Second Circuit in *Automobile Club of New York, Inc. v. Cox*, 444 F.Supp. 174 (S.D.N.Y.1978), *aff'd*, 592 F.2d 658 (2d Cir.1979).

In 1978 this Court denied the Auto Clubs' motion for a preliminary injunction to prevent enforcement of the Port Authority's bridge toll increases. The Court rejected the Auto Clubs' argument that only the Port Authority's *bridges* could be included in the rate base, and upheld the Administrator's determination that the rate base could include not only the Port Authority's bridges, but its tunnels, bus terminals, and PATH system as well. 444 F.Supp. at 177.

The Second Circuit (Friendly, J.) affirmed the district court in an opinion which noted that the inclusion of the PATH system in the rate base for setting bridge tolls was a "serious question" in light of Congress' failure to enact legislation specifically permitting or prohibiting the Port Authority to use surplus bridge tolls to finance the PATH trains:

> [T]he inclusion of PATH is still a giant leap from anything previously taken into account in determining appropriate rates under the "reasonable and just" provision of the General Bridge Act of 1906. The PA witness stated that, because of its location, the George Washington Bridge traffic is "predominately peripheral"; shutting down PATH thus would affect it in the first instance less than the tunnels; it is the overcrowding of the latter that might congest the Bridge. The question was not whether PATH requires subsidization but whether, in the absence of Congressional action such as the 1952 legislation concerning DRPA,[10] PATH can properly be loaded onto users of the PA bridges—three of which have almost no functional relation-

ship and the fourth, the George Washington Bridge, only a small one.

592 F.2d at 672 (footnote supplied).

Judge Friendly finally concluded that because it appeared that the Federal Highway Administrator was confronted with two difficult options—to include only bridges in the rate base, versus including bridges, tunnels, terminals and PATH in the rate base—the choice in favor of the latter should be left undisturbed:

> We therefore affirm, but with the caveat that this shall not be deemed to constitute an approval or rejection of the Administrator's action or to preclude a new protest, taking account of points raised in this opinion and others, unless new legislation or the regulations required by § 133(b) of the Federal–Aid Highway Act of 1973, which would remove or alter the points in controversy, is forthcoming within a reasonable time.

*Id.* at 673.

The specific legislation or regulations to which Judge Friendly alluded have not been forthcoming. In the absence thereof, a source of persuasive guidance exists in gas and electric public utility ratemaking cases in which courts have interpreted and applied the standard of "just and reasonable" rates. The principles of law utilized therein are applicable as well, by analogy, in the application of the standard of justness and reasonableness of bridge tolls.

In such cases the courts and administrative agencies consistently conclude that "just and reasonable" rates should "enable the company to operate successfully, to maintain its financial integrity, to attract capital, and to compensate its investors for the risks assumed." *Federal Power Commission v. Hope Natural Gas Co.*, 320 U.S. 591, 605, 64 S.Ct. 281, 298, 88 L.Ed. 333 (1944).

These same tribunals in turn utilize the "used and useful" principle to determine whether qualitatively different facilities

---

reasonable once the rate base has been established.

**10.** The Delaware River Port Authority (DRPA) was governed by the new General Bridge Act of 1946, 33 U.S.C. §§ 525–33 (1982), which tightly

restricted the uses to which the DRPA's toll revenues could be used. *See* footnote 8, *supra*. These provisions were later repealed by the Highway Act of 1987.

may be included within one rate base. The principle provides that "an item may be included in a rate base only when it is 'used and useful' in providing service. In other words, current rate payers should bear only legitimate costs of providing service to them." *Tennessee Gas Pipeline Co. v. F.E.R.C.*, 606 F.2d 1094, 1109 (D.C.Cir. 1979), *cert. denied*, 445 U.S. 920, 100 S.Ct. 1284, 63 L.Ed.2d 605 *and* 447 U.S. 922, 100 S.Ct. 3012, 65 L.Ed.2d 1113 (1980).

In *Natural Gas Pipeline Co. of America v. F.E.R.C.*, 765 F.2d 1155 (D.C.Cir. 1985), *cert. denied*, 474 U.S. 1056, 106 S.Ct. 794, 88 L.Ed.2d 771 (1986), for example, the District of Columbia Circuit ultimately upheld the Federal Energy Regulatory Commission's exclusion from a gas pipeline company's rate base those expenses it incurred in pursuing unsuccessful gas supply projects. In so holding, the Court of Appeals noted the distinction between the inclusion of expenses associated with the pipeline company's unsuccessful gas *supply* projects, as opposed to those associated with its unsuccessful gas *storage* projects:

> The Commission has explained that it permitted amortization of losses on these storage projects because the projects *"represented an effort on behalf of the companies to improve the quality and quantity of service systemwide. These were not individual projects of a short duration intended for the benefit of a small group of customers to meet a special service requirement"* . . . .

> Pipelines must have storage facilities, and efforts to find and secure those facilities are essential to maintaining the ordinary equipment of a pipeline company. Production activities are fundamentally different. It may be prudent and even necessary for pipelines to enter the production business . . . if the pipeline's suppliers appear unable to meet future needs of the pipeline's customers. But these production activities are not the normal activity of a pipeline seeking to maintain its physical plant and equipment; they are the normal activity of a producer, to which quite different rules apply.

765 F.2d at 1164-65 (emphasis supplied). The court included in a rate base projects which were "nearly inevitable result[s]" of efforts to meet the demand for the services of the utility. *Id.* at 1165.

In the same vein, other courts have approved the inclusion of several related activities within the same rate base. *See Federal Power Commission v. Texaco, Inc.*, 417 U.S. 380, 387, 94 S.Ct. 2315, 2321, 41 L.Ed.2d 141 (1974) (upholding an FPC order which would indirectly pool area rates charged by large gas producers with those charged by smaller producers: "[t]hat every rate of every natural gas company must be just and reasonable does not require the cost of each company to be ascertained and its rates fixed with respect to its own costs"); *Papago Tribal Utility Authority v. F.E.R.C.*, 773 F.2d 1056, 1060 (9th Cir.1985) (upholding FERC's inclusion of a nuclear power plant meeting increased demand for electricity in the rate base of a statewide electric utility company which had also operated steam electric generating stations, among other facilities), *cert. denied*, 475 U.S. 1108, 106 S.Ct. 1515, 89 L.Ed.2d 913 (1986); *American Public Gas Ass'n v. Federal Power Commission*, 567 F.2d 1016, 1049-1051 (D.C.Cir.1977) (upholding the Federal Power Commission's establishment of national natural gas rates which did not differentiate between onshore and offshore gas sources), *cert. denied*, 435 U.S. 907, 98 S.Ct. 1456, 55 L.Ed. 2d 499 (1978); *American Electric Power Service Corp.*, 37 F.E.R.C. ¶ 63,032 (1986) (upholding an agreement between five electric companies to share costs of ownership and operation of a common high voltage transmission system despite the contention that the agreement inadequately recognized the different levels of benefits conferred on the different companies: "So long as a utilities rate base is used and useful in supplying its customers, a return is earned on the entire investment without consideration of differing benefits conferred by different parts of the investment, and all the same class of customers may be charged the same rates despite the fact that some may benefit more than others"). *Cf. Public Service Commission of State of*

*N.Y. v. F.E.R.C.*, 813 F.2d 448, 454–56 (D.C.Cir.1987) (upholding FERC's decision to exclude from gas pipeline's rate base administrative expenses for advertisements intended solely to enhance its parent company's image).

These cases suggest by analogy that those Port Authority activities which represent efforts to improve the quality and quantity of its services systemwide—and do not represent efforts to expand its operations or to provide substantively different types of services—may be included in the Port Authority's rate base.

Similarly, *Natural Gas Pipeline*'s "systemwide" approach suggests that the Court should not utilize a narrow origin-and-destination analysis to determine whether all the Port Authority facilities at issue are sufficiently related to each other to be included in the same rate base. The "spillover" effect from facility to facility within the Port Authority system indicates that each Port Authority facility, including PATH, contributes to the Port Authority's duty to efficiently provide transportation to passengers and riders over and under the waterways between southern New York and northern New Jersey and vice-versa. *See Algonquin Gas Transmission Co.*, 22 F.E.R.C. ¶ 61,279 (1983) (allowing inclusion of expenses for advertisements "oriented toward information and conservation" in gas pipeline's rate base, despite the fact that an actual showing of direct consumer benefit would be "virtually impossible" to make.)

Given this background of analogous principles, it would seem anomalous to exclude PATH from the Port Authority rate base used to set tolls for its bridges. The Port Authority was originally created to develop a better coordination of the terminal, transportation and other facilities of commerce in, about, and through the Port of New York District. The precise form in which the Port Authority provides transportation across and under these waterways should not be dispositive: the agency's duty is to provide such transportation efficiently and reasonably—be it by bus, automobile, tunnels, train, or boat. Thus Dr. Marcus's testimony that "it makes no economic sense" to exclude PATH from the network providing all water-crossing transportation on Port Authority facilities seems precisely on point.

Furthermore, the evidence shows (1) there is a direct relationship between PATH and the Lincoln and the Holland tunnels, and that there is at least some relationship between PATH and the George Washington Bridge; (2) there is at least some relationship between the George Washington Bridge and the Staten Island Bridges—the Bayonne Bridge, the Goethals Bridge, and the Outerbridge Crossing; (3) the Holland Tunnel provides an alternative for the users of the Staten Island bridges and vice-versa; (4) the Lincoln Tunnel provides an alternative for users of the Holland Tunnel; and (5) PATH provides an alternative for those passengers wishing to get into Herald Square in the CBD (Central Business District).

Once this is established, the Auto Clubs are on "weak ground" in opposing the combination of all the facilities among which there exists this conceded relationship. The public utility case law suggests that the Court must consider the *systemwide* connection between its ITN facilities, and the "almost inevitable" consequences of the Port Authority's attempts to provide efficient transportation over the waterways. The fact that the Port Authority already feels compelled to institute a ferry system, for example, to fulfill the increased demand for its cross-water transportation facilities illustrates the problem quite graphically.

The absence of specific statutory authorization to include PATH in the rate base for bridges should not prevent the Court from doing so. In the "used and useful" cases cited above, the only guidelines mandated by statute were that the rates be "just and reasonable."

■ As a further objection to the inclusion of PATH's deficits in the rate base, the Auto Clubs assert that PATH has not conducted any studies measuring the impact of a PATH fare increase on PATH ridership and therefore has not made rea-

sonable efforts to maximize PATH revenues.

While it does not appear that the Port Authority conducted any formal studies on the effect of various PATH fare levels on PATH ridership, the trial evidence indicated that the PATH Board "knew" that every ten-cent increase in PATH fares produces about $6 million in revenues if ridership remains constant. With this figure in mind, the Port Authority Board considered a number of factors in deciding whether to raise its bridge and tunnel tolls and/or its PATH fares in early 1987: the administrative convenience of charging "round figures" for its tolls and fares, the amount of net revenue yield generated by each level of increase, and so on. The trial testimony also showed that the expenses incurred by PATH in providing mass transit services to its passengers are reasonable and necessary and consistent with the Port Authority's duty to maintain tolls that are fair and reasonable. These factors, combined with the fact that PATH's returns are in line with other urban subway transit systems which typically only recoup about 50% of their expenses through passenger fares, suggest that the Port Authority addressed the question raised by the Auto Clubs and justly and reasonably reached its decision to raise tolls and fares in early 1987 to cover the operating and capital costs of all its ITN facilities, and that the users of PATH are paying a fair share of the expenses of crossing the Hudson.

And, since the Auto Clubs have conceded that the rates of return on the Port Authority's investment are "within the zone of reasonableness" once PATH is included in the rate base, the Auto Clubs' claims for prospective relief under the Federal Highway Act must accordingly be dismissed.

### C. Defendants' Alleged Violation of the Commerce Clause

■ The Auto Clubs further claim that defendants' imposition of tolls which generate revenues well in excess of those necessary for construction, operation, and maintenance of its bridges, tunnels and terminals imposes an excessive burden on interstate commerce in violation of the Commerce Clause.

Where Congress has not pre-empted the states from regulating interstate commerce in a given area, the courts employ a three-part test to determine the validity of a state's regulation of such activity under the Commerce Clause:

> (1) whether the challenged [state action] regulates evenhandedly with only "incidental" effects on interstate commerce, or discriminates against interstate commerce either on its face or in practical effect; (2) whether the [state action] serves a legitimate local purpose; and, if so, (3) whether alternative means could promote this local purpose as well without discriminating against interstate commerce.

*Hughes v. Oklahoma*, 441 U.S. 322, 336, 99 S.Ct. 1727, 1736, 60 L.Ed.2d 250 (1979).

The Auto Clubs have not produced any facts which would support a claim of constitutional infringement under this test: the toll serves a legitimate local purpose, it almost certainly does not have anything more than an incidental effect upon interstate commerce (since it does not interfere with a whole host of other means of access to the city), and plaintiffs suggest no alternatives to the toll which would not also have an effect on interstate commerce. Moreover, the propriety of including PATH in the Port Authority rate base by definition leads to the conclusion that such inclusion of PATH does not constitute an "excessive" burden on commerce.

### D. Defendants' Alleged Violation of 42 U.S.C. § 1983

Because the Auto Clubs' § 1983 claim against the Commissioner defendants is wholly dependent upon the Court's determination of whether the Port Authority (and thereby the Commissioners) violated the Highway Act or the Commerce Clause of the Constitution, the above discussion also controls the disposition of the defendants' Fifth Claim for relief for defendants' alleged violation of 42 U.S.C. § 1983.

## Conclusion

Plaintiffs' Amended Complaint is accordingly dismissed on the merits and judgment is directed in favor of the defendants and against the plaintiffs, with costs.

The foregoing, together with the additional specific findings of fact and conclusions of law filed herewith, shall constitute the Findings of Fact and Conclusions of Law required by Fed.R.Civ.P. 52(a).

SO ORDERED.

## ADDITIONAL FINDINGS OF FACT AND CONCLUSIONS OF LAW

### THE PARTIES

* 1. The Automobile Club of New York, Inc. with its principal place of business located at 28 East 78th Street, New York, New York and five member clubs comprising the AAA Clubs of New Jersey with their principal place of business located at 418 Hamburg Turnpike, Wayne, New Jersey (hereinafter the Automobile Club of New York, Inc. and the AAA Clubs of New Jersey shall be collectively referred to as the "Auto Clubs") are non-profit corporations organized with the intention of promoting the interest and welfare of motor vehicle users.

* 2. The names and addresses of the five member clubs comprising the AAA Clubs of New Jersey are:

Automobile Club of Central New Jersey, Inc.
AAA Drive and Route 130
Robbinsville, New Jersey 08691
New Jersey Automobile Club, Inc.
1 Hanover Road
Florham Park, New Jersey 07932
North Jersey Automobile Club, Inc.
418 Hamburg Turnpike
Wayne, New Jersey 07470
Automobile Club of Southern New Jersey, Inc.
201 Kings Highway
Cherry Hill, New Jersey 08034
AAA West Jersey

Memorial Parkway at Firth Street
Phillipsburg, New Jersey 08865

* 3. The Auto Clubs have a combined membership exceeding 1.7 million members, many of whom make use of the facilities comprising the Port Authority of New York and New Jersey's ("Port Authority") Interstate Transportation Network.

* 4. The Port Authority of New York and New Jersey ("Port Authority") is a body corporate and politic created in 1921 by Compact between the States of New York and New Jersey with the consent of the Congress of the United States.

* 5. One of the principal purposes of the 1921 Compact was to develop a better coordination of the terminal, transportation and other facilities of commerce in, about and through the Port of New York District.

* 6. The Port of New York District encompasses an area which lies within a 25 mile radius of the Statue of Liberty, the exact boundaries of which are set forth in N.Y.Unconsol.L. § 6403 (McKinney 1979) and N.J.S.A. § 32:1–3 (West 1963).

### THE PORT AUTHORITY'S INTERSTATE TRANSPORTATION NETWORK

* 7. At the present time, pursuant to its Compact powers, and subsequent amendments and supplements thereto, the Port Authority owns and/or operates various facilities within the boundaries of the Port of New York District including the following facilities comprising its Interstate Transportation Network: four interstate bridges, the George Washington Bridge (including the George Washington Bridge Bus Station), the Bayonne Bridge, the Goethals Bridge and the Outerbridge Crossing; two interstate tunnels, the Lincoln Tunnel and the Holland Tunnel; one bus terminal, located at 40th Street and 8th Avenue in Manhattan; the Port Authority Trans–Hudson Railroad ("PATH"); and the Port Authority Bus Programs.

* 8. The facilities comprising the Port Authority's interstate Transportation Network were opened on the following dates:

---

* The findings of fact preceded by an asterisk are factual findings agreed to by stipulation of the parties.

| Facility | Date Opened |
|---|---|
| Holland Tunnel | 1927 * |
| Lincoln Tunnel | |
| First Tube | 1937 |
| Second Tube | 1945 |
| Third Tube | 1957 |
| George Washington Bridge Facility | |
| Bridge Structure (w/o lower level) | 1931 |
| Lower Level | 1962 |
| GWB Bus Station | 1963 |
| Bayonne Bridge | 1931 |
| Goethals Bridge | 1928 |
| Outerbridge Crossing | 1928 |
| Port Authority Bus Terminal | |
| Main Bus Terminal | 1950 |
| First Expansion of Main Bus Terminal | 1963 |
| Bus Terminal North Wing | 1981 |
| Port Authority Trans–Hudson (PATH) | 1908 ** |
| Journal Square Transportation Center | 1975 |
| Port Authority Bus Programs | 1979 and 1982 |

* Acquired 1931                    ** Acquired 1962

---

* 9. The Port Authority's bridges, tunnels, terminals, PATH and Bus Programs are involved in the movement of people and freight across the interstate waters of the Port of New York District.

* 10. On a typical weekday in 1987, between the hours of 7:00 and 10:00 a.m., over 255,000 people travelled by automobile, rail, and bus in the eastbound direction across the interstate waters of the Port District. These 255,000 trips are broken down as follows: auto—78,500; bus—81,500; PATH—69,000; and other rail to Penn Station New York—24,000. Except for those travelling on other rail to Penn Station New York, all of the trips involve use of either the Port Authority's vehicular crossings or PATH.

* 11. In 1967, 55,200 automobile passengers used the Port Authority's vehicular crossings during the typical weekday peak period (7:00—10:00 a.m.) in the eastbound direction. In 1977, 66,900 automobile passengers used the Port Authority's vehicular crossings during the typical weekday peak period. In 1987, 78,500 automobile passengers used the Port Authority's vehicular crossings during the typical weekday peak period.

* 12. In 1967, 75,100 bus passengers used the Port Authority's vehicular crossings during the typical weekday peak period (7:00—10:00 a.m.) in the eastbound direction. In 1977, 63,400 bus passengers used the Port Authority's vehicular crossings during the typical weekday peak period. In 1987, 81,500 bus passengers used the Port Authority's vehicular crossings during the typical weekday peak period.

* 13. In 1967, 43,700 passengers used the PATH system during the typical weekday peak period (7:00—10:00 a.m.) in the eastbound direction. In 1977, 48,200 passengers used the PATH system during the typical weekday peak period. In 1987, 69,400 passengers used the PATH system during the typical weekday peak period.

* 14. The majority of vehicles that use the Port Authority's bridges and tunnels on an average weekday (as of 1983—60%) have neither origin or destination in Manhattan and on weekends at least 66% of those vehicles have neither origin nor destination in Manhattan.

15. The efficient and cost-effective functioning of the Port Authority's Interstate Transportation facilities mandates their maintenance and operation as an intergrated interdependent transportation system.

16. Closing one or more of the Port Authority's cross-water facilities results in

a "spill-over" effect, increasing congestion in the others.

17. Improvements to one of the Port Authority's cross-water facilities benefits users of the others by making the entire network more efficient and reducing congestion.

* 18. After the institution of one-way tolls on the Verrazano Narrows Bridge, truck traffic using the Holland Tunnel during the period between 3:30 and 6:30 p.m. increased 69.8%.

19. A New York State Department of Transportation report, dated May 1, 1987, entitled "Final Report on the Verrazano Bridge Tolls" concluded:

> One might expect that any traffic diversion would be absorbed entirely by the Holland Tunnel, the Verrazano–Narrows Bridge's nearest competitor. However, if volumes increase at the Holland tunnel some trips that might have been made at the Holland Tunnel are pushed north to the Lincoln Tunnel in order to avoid the increased congestion. A similar effect at the Lincoln Tunnel leads to increased volumes at the George Washington Bridge. Similarly, if change results in travel shifts from the Holland Tunnel to the Verrazano–Narrows Bridge, volumes on the Lincoln Tunnel and perhaps the George Washington Bridge will also show a decline.

20. The Holland Tunnel provides an alternative for the users of the Staten Island bridges.

21. The Staten Island bridges provide an alternative to the users of the Holland Tunnel.

22. The Lincoln Tunnel provides an alternative for the users of the Holland Tunnel.

23. If somebody wanted to get into Herald Square, PATH provides an alternative for both the Holland and Lincoln Tunnels.

24. The Port Authority's bridges, tunnels, bus terminal, PATH, and Bus Programs form an integrated interdependent transportation system.

## PATH IN THE RATE BASE

* 25. It is conceded that if PATH is included in the rate base, the rate of return being earned by the Port Authority is within the zone of reasonableness. (Trial Transcript, p. 103)

26. From an economic perspective it is necessary and appropriate to include in the investment rate base all the elements of the Port Authority's Interstate Transportation Network, including PATH.

* 27. In 1987, PATH handled close to 70,000 people during the 7:00 to 10:00 a.m. period in the eastbound direction. The Holland Tunnel handled 8,900 people or about one-eighth the amount of people handled by PATH. The Lincoln Tunnel handled 17,600 people or about one-fourth of the amount handled by PATH.

* 28. The cost of constructing a substitute for PATH would be $2.5 billion, exclusive of the cost of real property acquisition, toll plaza expansion, and approach roadways. An operating loss of $309 million is projected for the "PATH Substitute" in 1991 as compared with a projected operating loss of $186 million under the present system.

29. It is less costly for the users of the Port Authority's vehicular crossings to subsidize the losses incurred by the PATH rapid transit system than it would be to provide for the movement of the same number of interstate passengers by other means such as the construction and operation of a new vehicular crossing.

30. The integrated system approach for the movement of passengers and freight across the interstate waters of the Port Authority's various bridges, tunnels, terminals and the PATH rapid transit system results in a structure of charges that is consistent with a reasonably functional and cost pattern for traffic.

31. The expenses incurred by PATH are reasonable and necessary.

32. It is not feasible to charge a fare on PATH that would be equal to all of the costs associated with running that system as an independent entity.

33. The current one-way PATH fare of $1.00 is at the same level as the current "round-trip" bridge and tunnel toll of $2.00 for commuters using the commuter discount ticket books.

## HISTORY OF TOLL AND FARE INCREASES

* 34. Effective May 5, 1975, the Port Authority, pursuant to resolutions of its Board of Commissioners dated April 10 and April 21, 1975, raised the non-discounted, eastbound passenger car toll on its interstate bridges and tunnels by 50% from $1.00 to $1.50. (Tolls are charged only in the eastbound direction.) The PATH fare was not increased at this time but remained at 30 ¢, the rate which was in effect at the time the Port Authority acquired the PATH railroad in 1962.

* 35. On July 31, 1983, the PATH fare was increased to 50¢.

* 36. Effective January 1, 1984, the Port Authority, pursuant to a resolution of its Board of Commissioners dated November 10, 1983, raised the non-discounted, eastbound passenger car toll on its interstate bridges and tunnels from $1.50 to $2.00.

* 37. On June 3, 1984, the PATH fare was increased to 75¢.

* 38. Effective April 12, 1987, the Port Authority, pursuant to a resolution of its Board of Commissioners dated March 12, 1987, raised the non-discounted, eastbound passenger car toll on its interstate bridges and tunnels by 50% from $2.00 to $3.00. Bus tolls were increased from $2.00 to $3.00 and truck tolls rose from $1.50 per axle to $3.00 per axle (tolls are charged only in the eastbound direction). In addition, the price of the Commuter Discount Ticket Book of 20 tickets was increased from $20.00 to $40.00, reflecting a $1.00 discount from the new $3.00 cash automobile toll. There was no increase in the price of reduced rate carpool ticket books ($30.00 for 60 tickets), and toll scrip remains available at a 10% discount from the cash toll.

* 39. On the same day that the Port Authority Board of Commissioners adopted the resolution promulgating the April 12, 1987 bridge and tunnel tolls increase, the PATH fare was raised from 75¢ to $1.00, effective April 12, 1987.

* 40. The history of the Port Authority's toll and fare increases is summarized in the table below:

|  | "Round–Trip" Bridge & Tunnel Cash Toll | "Round–Trip" Commuter Discount Ticket Book Toll | "Round–Trip" PATH Fare |
|---|---|---|---|
| Prior to 1975 | $1.00 | $ .50 | $ .60 |
| 5/5/75 | 1.50 | 1.00 | – |
| 7/31/83 | – | – | 1.00 |
| 1/1/84 | 2.00 | – | – |
| 6/3/84 | – | – | 1.50 |
| 4/12/87 | 3.00 | 2.00 | 2.00 |

## THE PORT AUTHORITY'S CAPITAL PROGRAM

* 41. The Port Authority's Capital Program for the years 1987–1991 called for the expenditure of $1.47 billion for additions and improvements to the Port Authority's Interstate Cross Water Facilities which includes its bridges, tunnels, bus terminal, PATH, its bus programs, regional transportation projects and a proposed Hoboken/lower Manhattan ferry service.

* 42. Out of the projected $1.47 billion, $830 million has been earmarked by the Port Authority for the PATH system and $150 million has been allotted for the implementation of the Hoboken/lower Manhattan ferry service. The remaining $495 million is earmarked for projects relating to the Port Authority's bridges, tunnels and bus terminal system improvements.

43. The level of tolls and fares in existence before the April 12, 1987 increase would have been inadequate to operate the Port Authority's network of bridges, tunnels, terminals and PATH and finance the 1.5 billion dollar capital program.

44. Other net revenues from the Port Authority would have been inadequate to take care of the network's operating deficits and capital program.

## HOW THE PORT AUTHORITY RAISES CAPITAL

* 45. The Port Authority, lacking both the power to pledge the credit of either the State of New York or the State of New Jersey and the power to levy taxes, finances its projects by the sale of bonds to the investing public.

46. When the Port Authority sells bonds, many conservative members of the investment community look for a net revenue coverage of the current year of 1.8 to 2.1 times of the current debt service.

* 47. In order to issue any new consolidated bonds, the Port Authority is obligated by contract with its consolidated bondholders to demonstrate and, with respect to holders of bonds issued since 1958, certify that certain conditions exist which justify the issuance of the new bonds.

48. The Port Authority is contractually obligated to the holders of its consolidated bonds not to issue any new consolidated bonds unless it can show at the time of such issuance that the net revenues from its facilities in a consecutive 12–month period (out of a prior 36–month period) are at least equal to 1.3 times the debt service on all bonds secured by the General Reserve Fund in the future calendar year in which such debt service is at a maximum.

## TOLLS ON COMPARABLE FACILITIES

* 49. The Port Authority's non-discounted cash "round-trip" automobile rate of $3.00 is lower than the $4.00 charged on the Triborough Bridge and Tunnel Authority's major bridge and tunnel facilities, i.e., the Triborough, Bronx Whitestone, Throgs Neck, and Verrazano Narrows Bridges and the Queens Midtown and Brooklyn Battery Tunnels. The Port Authority's bus tolls and truck tolls are lower than those on the Triborough Bridge and Tunnel Authority's major bridge and tunnel facilities.

## IMPACT OF INFLATION ON PORT AUTHORITY TOLLS

* 50. A comparison of the Port Authority's vehicular tolls for passenger automobiles with the Consumer Price Index for the years 1927–1987 shows that:

### TOLL BY CPI ADJUSTMENT

| | |
|---|---|
| 1927 CPI (All Items) | 52.0 |
| 1987 CPI (New York—North Eastern New Jersey—All Urban Consumers) | 340.9 |
| Percentage Increase | 556% |
| 1927 Toll (Round Trip—Auto) | $1.00 |
| 1987 Toll (Round Trip—Auto) | $3.00 |
| Percentage Increase | 200% |
| 1987 Toll by CPI Adjustment (Round Trip—Auto) | $6.56 |

(1927 is the year that the Holland Tunnel was opened.)

* 51. A comparison of the Port Authority's vehicular tolls for passenger automobiles with the Consumer Price Index for the years 1974–1987 shows that:

### TOLL BY CPI ADJUSTMENT

| | |
|---|---|
| 1974 CPI (New York—North Eastern New Jersey—All Urban Consumers) | 154.8 |
| 1987 CPI (New York—North Eastern New Jersey—All Urban Consumers) | 340.9 |
| Percentage Increase | 120.2% |
| 1974 Toll (Round Trip—Auto) | $1.00 |
| 1987 Toll (Round Trip—Auto) | $3.00 |
| Percentage Increase | 200% |
| 1987 Toll by CPI Adjustment (Round Trip—Auto) | $2.20 |

(The Port Authority, while agreeing to the accuracy of the above numbers, believes that utilizing the year 1974 as a basis of comparison is extremely misleading, since 1974 is the year immediately prior to the Port Authority's first toll increase.)

* 52. A comparison of the Port Authority's vehicular tolls for passenger automobiles with the Consumer Price Index for the years 1945–1987 shows that:

| | |
|---|---|
| 1945 CPI (New York—North Eastern New Jersey—All Urban Consumers) | 54.5 |
| 1987 CPI (New York—North Eastern New Jersey—All Urban Consumers) | 340.9 |
| Percentage Increase | 526% |
| 1945 Toll (Round Trip—Auto) | $1.00 |
| 1987 Toll (Round Trip—Auto) | $3.00 |
| Percentage Increase | 200% |
| 1987 Toll by CPI Adjustment (Round Trip—Auto) | $6.26 |

(1945 is the average of the years when the first crossing (Holland Tunnel) opened and

when the last major increment of crossing capacity (Lower Lever—GWB) was added.)

RATES OF RETURN

* 53. The Port Authority's bridges, tunnels and terminals generated $243.7 million in revenues in 1986 against total expenses of $213.4 million (operating and maintenance expenses of $147.6 million, allocated expenses of $48.9 million and depreciation of $16.9 million).

* 54. The facilities comprising the Port Authority's Interstate Transportation Network, that is, its bridges, tunnels and terminals, PATH, and the Bus Programs, generated $292.7 million in revenues in 1986 against total expenses of $383.4 million (operating and maintenance expenses of $257.5 million, allocated expenses of $71 million and depreciation of $54.9 million), resulting in an overall deficit of $90.7 million.

* 55. The Port Authority's rates of return calculated on a rate base which includes the bridges, tunnels and bus terminal, but *excludes PATH*, Ferry Service, Bus Programs and Regional Transportation Projects, are set forth below:

| | Unamortized Investment in Use | Gross Investment | Replacement Cost |
|---|---|---|---|
| 1986 actual | 4.9% | not calculated | not calculated |
| 1987 actual | 16.9% | 11.7% | 3.0% |
| 1988 projected | 19.6% | 12.7% | 3.3% |
| 1989 projected | 18.0% | 11.7% | 3.0% |
| 1990 projected | 15.6% | 10.3% | 2.7% |
| 1991 projected | 12.3% | 8.7% | 2.3% |

* 56. It is conceded that even if PATH is excluded from the rate base, under the Replacement Cost method the resultant rates of return are within the zone of reasonableness.

* 57. (as revised) The Port Authority's rates of return calculated on a rate base which *includes* the Port Authority's entire Interstate Transportation Network, that is, its bridges, tunnels and bus terminal, *PATH*, Ferry Service, Bus Programs and Regional Transportation Projects, are set forth below:

| | Unamortized Investment in Use | Gross Investment | Replacement Cost |
|---|---|---|---|
| 1987 actual | Negative | 2.6% | .5% |
| 1988 projected | Negative | 2.6% | .5% |
| 1989 projected | Negative | 2.0% | .4% |
| 1990 projected | Negative | 1.3% | .3% |
| 1991 projected | Negative | .4% | .1% |

CONCLUSIONS OF LAW

1. The Port Authority of New York and New Jersey, was created in 1921 by a Congressionally-consented-to Compact between the States of New York and New Jersey to plan, develop and effectuate public transportation, terminal and other facilities of commerce within the Port of New York District which is the area approximately within a 25–mile radius of the Statue of Liberty.

2. The Port Authority is a multi-modal transportation agency whose bridge tolls are required to be "just and reasonable."

3. The Conference Report in support of the legislation divesting the Federal Highway Administrator of jurisdiction to review bridge tolls states that:

this just and reasonable requirement is not intended to interfere with or in any way restrict existing authority granted to multi-modal transportation agencies, such as the Port Authority of New York and New Jersey, that operate bridges along with other facilities to use bridge toll revenues for non-bridge purposes or the pooling or combination of the revenues from all of their facilities. (H.Conf.

284

Rep. No. 100–27, 100th Cong., 1st Sess. 175 (1987), *reprinted in* [1987] U.S.Code Cong. & Ad.News 121, 159).

4. The term "reasonable and just" does not prescribe an inflexible mechanical formula but rather permits necessary flexibility in rate-making.

5. The Port Authority is entitled to earn a fair return upon the total investment in those of its facilities which form an integrated, interdependent transportation system, making possible the movement of people across the interstate waters of the Port of New York District.

6. The toll revenues received for use of the Port Authority's four bridges do not exceed a reasonable rate of return when the bridges are considered as constituting component parts of an integrated system of Authority operated bridge, tunnel, rail and terminal facilities, making possible an overall movement of traffic across the interstate waters of the bi-State Port of New York District if PATH is included in the rate base.

7. The existing tolls on the Port Authority's bridges are in all respects "just and reasonable" within the meaning of the Highway Act of 1987.